WASHINGTON LEGAL FOUNDATION; Allen D. Brown; Dennis H. Daugs; Greg Hayes; L. Dian Maxwell, Plaintiffs–Appellants,

v.

LEGAL FOUNDATION OF WASHINGTON; Kevin F. Kelly; Barbara Durham, Chief Justice; Gerry L. Alexander, Justice; James M. Dolliver, Justice; Richard P. Guy, Justice; Charles Wayne Johnson, Justice; Barbara A. Madsen, Justice; Charles Z. Smith, Justice; Philip A. Talmadge, Justice, Defendants–Appellees.

No. 98–35154.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 9, 2000

Filed Jan. 10, 2001

Richard A. Samp and Daniel J. Popeo, Washington Legal Foundation, Washington, D.C., James J. Purcell, Seattle, Washington, for the appellants.

David J. Burman, Perkins Coie, LLP, Seattle, Washington, for appellees Legal Foundation of Washington and Bradley C. Diggs.

Maureen Hart, Senior Assistant Attorney General, Olympia, Washington, for appellee Justices of the Washington Supreme Court.

Thomas P. Brown, Heller Ehrman White & McAuliffe, San Francisco, California, for amici curiae Alaska Bar Foundation, Arizona Bar Foundation, Hawaii Justice Foundation, Montana Law Foundation, Nevada Law Foundation, and Oregon Law Foundation.

Peter M. Siegel, Florida Justice Institute, Inc., Miami, Florida, for amici curiae, National Association of IOLTA Programs and 64 State IOLTA Programs, State Bar Associations, and other organizations concerned with the availability of legal aid to the poor.

Ronald T. Schaps, Bogle & Gates P.L.L.C., Seattle, Washington, for amicus curiae Washington State Bar Association.

Philip S. Anderson, President, American Bar Association, Chicago, Illinois, for amicus curiae American Bar Association.

Before: TROTT, KLEINFELD, and SILVERMAN, Circuit Judges.

KLEINFELD, Circuit Judge:

This case raises constitutional questions about Washington's program for applying interest on lawyers' (and others') trust accounts to various good works.

## I. FACTS

Lawyers' ethical requirements have long required that "[m]oney of the client or collected for the client ... should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."[1] The contemporary formulation is that a "lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person."[2]

---

1. *Canons of Professional Ethics* Canon 11(1908) (amended 1933).

2. *Model Rules of Professional Conduct* Rule 1.15(a) (1999).

In order to keep clients' money separated, a lawyer traditionally maintains a trust account separate from the law firm account, and keeps clients' money in the trust account. Clients advance money to lawyers for many reasons, such as for the closing of a business or real estate transaction, satisfaction of a claim, bail, and fees to be earned by the lawyer in the future but to be secured by the trust account deposit. Lawyers also receive money to be paid partly or entirely to their clients, perhaps after deduction of fees. Often insurance companies send settlement checks to plaintiffs' lawyers payable to the client "and" the lawyer. The lawyer has the client endorse the check for deposit in the trust account by the lawyer and subsequent disbursement after the check clears, to third parties with claims, to the lawyer for his fees, and to the client. Traditionally, a law firm maintained one trust account in a non-interest bearing checking account for all its clients. Occasionally a separate interest bearing trust account or other device was used for a single client's money when the amount is large enough or the duration long enough to be worth maintaining a separate account.

Earlier in the century, lawyers often used to keep clients' money in separate envelopes in office safes.[3] After World War II (perhaps partly because banks had become safer), lawyers started placing funds in bank accounts separate from their law firm accounts.[4] Neither device generated any interest for the client or the lawyer, and the lawyer had to pay fees to the bank to maintain the trust account. Though the lawyer held the client's money as a fiduciary,[5] failure to obtain interest for the client was generally not a breach of fiduciary duty because none was obtainable as a practical matter. Interest was not paid on money in checking accounts, but except where the size and duration of the deposit were both large, no one concerned themselves about it. For a client to obtain interest on an amount held in trust, the expected interest had to exceed the value of the lawyer's time needed to establish a separate account, or else seeking interest made no economic sense. For the occasional circumstance where it was worth the time, lawyers would establish a separate interest bearing trust account so that the client could get the interest.[6]

Two things precipitated a change from the tradition that no interest was obtained from lawyers' trust accounts. First, in the 1970's, interest rates reached unprecedented high levels. Suppose $30,000 from a routine personal injury settlement were left in a non-interest bearing trust account for two weeks, while the insurer's check cleared and court reporters' and other expenses were paid. When rates were only 3%, only $35 in interest was lost, an amount less than the lawyers' fees and bank charges that would be required to maintain a separate account to obtain the interest. But when money market funds were paying 19%, a client stood to lose $219 on the same deposit. The interest was just too much to ignore.

Previously, banks were receiving the benefit of the use of the money in lawyers' non-interest bearing trust accounts, effectively as free loans from lawyers' clients, because before 1980, federal law prohibited federally insured banks and savings and loans from paying interest on checking accounts.[7] The competitive pressure on banks from money market funds and others led to the second change, a new federal statute allowing payment of interest on some demand accounts.

The combination of statutory and regulatory changes allowing payment of inter-

---

**3.** *See Clark v. State Bar,* 39 Cal.2d 161, 166, 246 P.2d 1, 4 (1952).

**4.** *See id.* Some lawyers became troubled about amounts in trust exceeding FDIC insurance limits during the 80's when many banks failed.

**5.** *Model Rules of Professional Conduct* Rule 1.15 cmt. 1 (1999).

**6.** *See In re Massachusetts Bar Ass'n,* 395 Mass. 1, 478 N.E.2d 715, 716 (1985) (reviewing history of IOLTA movement).

**7.** *See* 12 U.S.C. § 371a.

est on some demand bank accounts and high interest rates led to programs in all the states[8] where lawyers' trust accounts generated interest applied by nonprofit foundations under bar or court supervision to charities, such as provision of free legal services for poor people. This case involves Washington's IOLTA ("interest on lawyers' trust accounts") program.

The Washington Supreme Court created an IOLTA program in 1984 and codified it in the Washington Rules of Professional Conduct.[9] Lawyers are required, on pain of professional discipline, to hold small and short term moneys in interest bearing trust accounts, with the interest going to the Legal Foundation of Washington.[10] The Legal Foundation is a charitable organization established by the Supreme Court of Washington. Clients' funds in lawyers' trust accounts generate interest that the banks pay to the Legal Foundation of Washington. Clients' knowledge or consent is not required. Clients are only entitled to the interest on their money, under the Washington IOLTA rules, if the interest earned would be greater than the bank fees and fees for lawyers' and accountants' time to establish a separate interest bearing account for the client or maintain sub-accounts in a pooled trust fund. The money held in trust for a length of time too short or in amounts too small to generate interest exceeding these fees and bank charges generates interest for the Washington Legal Foundation.[11]

This case has the unusual twist (factually unusual, but it makes no difference analytically) that the IOLTA rules apply to some people who are not lawyers, and the non-lawyers are the plaintiffs. Some duties traditionally performed by lawyers are also performed in some localities by non-lawyers, frequently raising questions among the state bars and supreme courts about whether those services constitute the unauthorized practice of law. The issue of non-lawyers preparing documents for real estate transactions has been resolved by the Washington Supreme Court. In its rules for the bar, the Court has provided for "limited practice of law" by "closing officers," who are not lawyers but may nonetheless prepare these documents.[12] Closing officers, like lawyers, take money into trust, typically as escrow agents taking into trust the seller's signed documents and the buyer's money and exchanging them. The Washington Supreme Court bar rules require that where a limited practice closing officer prepares the papers, the money must be placed into the same IOLTA accounts as lawyers' trust funds.[13]

The title and escrow companies that employ closing officers do not have the same historical traditions as the bar. Traditionally, lawyers never received anything of value from the banks they used for trust accounts, and had to pay the bank fees for

---

**8.** *See Phillips v. Washington Legal Foundation*, 524 U.S. 156, 159 n. 1, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998). Since *Phillips* was decided, the last adopting state, Indiana, has instituted an IOLTA program. *See Indiana Professional Conduct* Rule 1.15(d) (2000).

**9.** *Washington Rules of Professional Conduct* Rule 1.14 (2000).

**10.** *See id.* The rules provide:
A lawyer who receives client funds shall maintain a pooled interest-bearing trust account for deposit of client funds that are nominal in amount or expected to be held for a short period of time. The interest accruing on this account, net of reasonable check and deposit processing charges which shall only include items deposited

charge, monthly maintenance fee, per item check charge, and per deposit charge, shall be paid to The Legal Foundation of Washington, as established by the Supreme Court of Washington. All other fees and transaction costs shall be paid by the lawyer. A lawyer may, but shall not be required to, notify the client of the intended use of such funds.

**11.** *Washington Rules of Professional Conduct* Rule 1.14(2) (2000).

**12.** *Washington Admission to Practice Rules* Rule 12 (2000).

**13.** *Washington Admission to Practice Rules* Rule 12(b)-(c) (2000).

the trust accounts out of their law firm accounts, that is, the lawyers' own money. The escrow companies in Washington, like the lawyers, have in the past deposited money held in trust for customers in non-interest bearing trust accounts. Unlike the lawyers, the escrow companies have in the past received something of value in return from the banks. The banks did not pay them cash, but rather gave them credits applicable against bank fees. The credits were applied to such items as bank charges for money transfers, account reconciliations, and returned checks. Some escrow companies now charge their customers what they call "IOLTA fees" on the theory that IOLTA costs them money because they have lost these bank credits.

The small amounts of interest from each transaction in lawyers' and escrow companies' trust accounts add up to a lot of money, even though interest rates are not nearly as high as they were twenty years ago. In 1990 the program yielded $3.9 million for the Legal Foundation of Washington, in 1995, $2.7 million.

Appellants have varying concrete interests in the IOLTA program. Mr. Brown regularly buys and sells real estate in the course of his business, has engaged in at least one transaction where he knows interest on his $90,521.29 advance went to the Legal Foundation of Washington through the IOLTA program, and declares "I object to anyone other than me taking the interest earned on my funds." Mr. Hayes declares likewise, and also objects "to some of the activities engaged in" by the Legal Foundation and those to whom it distributes IOLTA money. Mr. Daugs owns an escrow company and is a limited practice officer. According to his declaration, he has been violating the IOLTA rule so that his customers can have the benefit of earnings credits offsetting bank charges and because he objects to some activities of the Legal Foundation and its grantees. Ms. Maxwell is a former licensed limited practice officer employed by a title company that provides escrow services. Her company decided to fire all the limited practice officers to avoid the IOLTA rule

and keep the bank credits, so she had to surrender her license and quit using some of her valuable skills in order to keep her job.

As an example of the activities some plaintiffs object to, they submitted a letter from the Legal Foundation to a legal services program saying "[h]ave I got a deal for you.... This means you can do work without regard to [Legal Services Corporation] restrictions for the first three quarters." The Legal Services Corporation, a federally funded national legal services program, provides funding for programs in the states, but legal restrictions prevent legal services staff attorneys from engaging in certain activities. The IOLTA money from Washington Legal Foundation is not encumbered by these restrictions. Thus the named plaintiffs object not only to losing the interest that IOLTA receives, and losing the free bank services they formerly received, but also to how the Legal Foundation uses the interest it obtains on their trust funds.

The named appellants and Washington Legal Foundation, a public interest advocacy group, sued the Legal Foundation of Washington and the Washington Supreme Court. They sought a declaratory judgment that the rules requiring limited practice officers to place clients' funds into IOLTA trust accounts, Washington Admission to Practice Rules 12(h) and 12.1, violated their First and Fifth Amendment rights. They also sought an injunction against disciplinary action for violating the rules and a refund of whatever interest IOLTA received from their deposits. On cross motions for summary judgment, the defendants prevailed in district court.

## II. ANALYSIS

Plaintiffs argue that the interest on their trust accounts belongs to the clients, and that the IOLTA program violates their Fifth Amendment right to the interest by taking it without just compensation. Plaintiffs further argue that the program violates their First Amendment right by forcing them to finance speech to which they object. We do not reach the First

Amendment questions, because we conclude that plaintiffs are entitled to relief on their Fifth Amendment claim.

## A. Ripeness.

Defendants argue that the Fifth Amendment claim is not ripe under *Williamson County Reg'l Planning Comm'n v. Hamilton Bank.*[14]

In *Williamson*, a landowner sued in federal court for just compensation, claiming that county land use regulations were so onerous as to amount to a taking.[15] The Court held that the claim was not ripe for federal adjudication, because the landowner had not yet obtained a final decision from the county nor had it used the available state procedure for obtaining just compensation.[16] Under *Williamson*, ripeness of a claim for compensation for a taking requires that (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and (2) the claimant has sought "compensation through the procedures the State has provided for doing so."[17] Defendants' theory is that plaintiffs have not met these requirements, and must sue for inverse condemnation in state court under Washington law before their Fifth Amendment claim can be ripe for federal adjudication. Defendants did not dispute ripeness in district court, but we consider it lest we overstep our jurisdiction.[18]

Unlike *Williamson*, there is no ongoing regulatory proceeding, so there is no occasion, as there was in *Williamson*, to await a final decision. There, the county zoning process was not yet complete. Here, what is at issue are general rules, Washington Rules of Professional Conduct Rule 1.14 and Washington Admission to Practice Rule 12, not an individualized regulatory proceeding. The process of promulgating the final rule has long since been concluded. Thus the "finality" requirement of *Williamson* does not preclude ripeness.

Most of what is at issue in this case is declaratory and injunctive relief, not the takings claim for $20 or so of lost interest. That $20 tail cannot wag the dog of this constitutional challenge to the IOLTA program into state court. *Williamson* generally keeps claims for just compensation in state court, but it does not exclude from federal court a claim for declaratory and injunctive relief to establish that a state law, on its face, violates the Fifth Amendment.[19]

Also, *Williamson* does not apply where "the inverse condemnation procedure is unavailable or inadequate."[20] Where resort to state remedies would be futile,[21] as when the state has no "adequate provision for obtaining compensation at the time of the taking,"[22] the second *Williamson* re-

---

**14.** *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

**15.** *See id.* at 175, 105 S.Ct. 3108.

**16.** *See id.* at 186, 105 S.Ct. 3108.

**17.** *Id.* at 186, 194, 105 S.Ct. 3108.

**18.** *See Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1404 (9th Cir. 1989). We need not decide whether takings clause ripeness doctrine is, as plaintiffs contend and as applied to this case, merely prudential and not jurisdictional, *see Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997), because we reject defendants' ripeness argument.

**19.** *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997); *Yee v. City of Escondido*, 503 U.S. 519, 533–34, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

**20.** *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 197, 105 S.Ct. 3108, 87 L.Ed.2d 126.

**21.** *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999).

**22.** *San Remo Hotel v. City and County of San Francisco*, 145 F.3d 1095, 1101–02 (9th Cir. 1998).

quirement does not apply. Futility is plain here. There cannot be a remedy under state law, because it is state law, and not merely an action by particular officials, that is being challenged. Were there any doubt about how the Supreme Court of Washington would respond were a challenge to be brought, the doubt is eliminated because the Court has already spoken in this case. The justices of that court are among the defendants, and they have filed a brief as appellees. The justices of the Supreme Court of Washington do not argue that the case is unripe, nor do they argue on any ground that they ought to have the opportunity to rule on this case before the federal courts do, nor do they suggest that any state remedy might be available. The justices argue that the IOLTA rule does not violate the Fifth Amendment. The IOLTA rule at issue, and the brief, filed in the justices' capacity as such, leave no doubt that "the state has explicitly rejected its theory of the case." [23]

B. Property right.

 Defendants argue that the clients whose money is deposited into an IOLTA account do not own a property right in the interest that money earns, so the Fifth Amendment protection of property does not pertain. The Fifth Amendment protects property rights but does not create them.[24] Under Washington law, they argue, the common law rule, "interest follows principal," does not necessarily apply, so the owner of principal in a trust account does not necessarily own the interest it generates. The Washington Supreme Court expressly considered and rejected objections to its IOLTA program on Fifth Amendment grounds, and stated in response to the objections that "interest on short-term or nominal client funds ... does not constitute 'property' as defined by the United States or Washington Constitutions." [25]

One of the amicus briefs argues that "clients lose nothing because of IOLTA," because were it not for the pooling, the clients could get no interest, because the costs of administering the accounts to produce it would exceed the amounts produced. Indeed, the IOLTA rule is written so that if the interest would exceed the administrative costs of obtaining and crediting it, then the money should not be deposited into the IOLTA trust account.

This is more a practical than a legal argument insofar as it addresses who owns the interest. The claim is not that the trust accounts do not produce interest, but only that the administrative expense of sharing it among the clients would exceed the amount earned. The money deposited into the trust account is the clients' money. If the clients own the interest, it might be worth it to them to pay the expense and collect it even if the lawyers or escrow companies did not think it worth the bother. One of the affidavits in this case establishes that a client might well say (and the affiant more or less does), "it is not so much that I want the $20, though I do, as that I don't want the Legal Foundation's donees to get it, because I don't like what they do with it." If lawyers and escrow companies had to pay trust account interest to clients, then software programs might be developed to make it easy to do it. If pooling works to generate interest for IOLTA, then it could presumably be made to work to generate interest for clients. Also, as the affidavits in this case demonstrate, the clients can and do suffer a detriment if the interest is given to the Legal Foundation, because the escrow companies impose charges on the clients to compensate themselves for the bank credits they formerly obtained. The property question is whether the clients own the interest, not whether the amounts are so

---

**23.** *Levald, Inc. v. City of Palm Desert,* 998 F.2d 680, 689 (9th Cir.1993).

**24.** *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**25.** *IOLTA Adoption Order,* 102 Wash.2d 1101, 1109 (1984).

small it is not worth the clients' while to collect it.

The circuits had been split on this question,[26] and were when the district court ruled. Subsequent to that ruling, the Supreme Court definitively answered the question, in *Phillips v. Washington Legal Foundation:*[27] the clients own the interest.

Phillips was a Fifth Amendment challenge to the Texas IOLTA program. It is materially similar to the Washington IOLTA program at issue here. Similar language was used in Texas to limit the pooled IOLTA trust funds to short term and nominal amounts that would not generate interest for clients exceeding the administrative costs of paying it to the clients. The question the Court considered was "whether interest earned on client funds held in IOLTA accounts is 'private property' of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment."[28] The Court answered by saying, "[we] hold that it is the property of the client."[29]

Defendants argue that *Phillips* should be distinguished because it depends on Texas law, and Washington law differs. The distinction is unpersuasive, for several reasons. Basically, *Phillips* is not based on some odd quirk of Texas law, but on a fundamental and pervasive common law principle accepted by both states. The central question in this case was open and subject to serious arguments on both sides before *Phillips*, but not after.

*Phillips* begins with the proposition that the principal in the trust accounts belongs to the client. Though one the defendants' briefs argues otherwise, on the ground that a bank is merely a debtor of the depositor whose duties depend on contract, that proposition is irrelevant. The relationship at issue is not between the bank and the lawyer or escrow company, but between either of them and the client. The Washington IOLTA rules, like the Texas rules, refer to the money at issue as "client funds," and "funds of clients" and "his or her funds," as distinguished from "funds belonging to the lawyer."[30] The only reason that the moneys at issue go into trust accounts instead of the firm accounts of the lawyers and escrow companies is that the money belongs to the clients, not the lawyers or escrow companies.[31]

■ Next, *Phillips* takes note of the well established rule that "interest follows principal" "as the shadow the body."[32]

The rule that "interest follows principal" has been established under English common law since at least the mid-1700's. *Beckford v. Tobin,* 1 Ves.Sen. 308, 310, 27 Eng.Rep. 1049, 1051 (Ch. 1749) ("[I]nterest shall follow the principal, as the shadow the body"). Not surprisingly, this rule has become firmly embedded in the common law of the various States.[33]

Phillips also responds to the practical argument discussed above, that the IOLTA program takes interest only from clients who would receive none, because the amounts are too small or deposited for too short a time to generate interest in excess of administrative expense to distribute it. The Court held that the interest is property protected under the Fifth Amendment even if "it lacks a positive

**26.** *Compare Cone v. State Bar of Florida,* 819 F.2d 1002 (11th Cir.1987) *with Washington Legal Found. v. Texas Equal Access to Justice Found.,* 94 F.3d 996 (5th Cir.1996).

**27.** *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**28.** *Id.* at 160, 118 S.Ct. 1925.

**29.** *Id.*

**30.** *Washington Rules of Professional Conduct* Rule 1.14 (2000).

**31.** *Model Rules of Professional Conduct* Rule 1.15 (1999).

**32.** *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 165, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**33.** *Id.*

economic or market value." [34] "While the interest income ... may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property." [35] This holding vindicates the plaintiffs' claim in the case at bar that they do not want interest on their money going to the application to which the Legal Foundation of Washington has elected to contribute it.

■ Phillips goes on to establish a striking proposition: states are not free to take away the client's property right to the interest by statutes depriving them of property rights in it. [36] This holding in *Phillips* speaks conclusively to defendants' argument that the clients in Washington do not own the interest because the Washington IOLTA rule so established as a matter of state law, and the Washington Supreme Court so stated in the dialogue about whether to adopt the IOLTA rule. The Supreme Court in *Phillips* noted that in a previous decision, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, [37] it held that a Florida statute governing interpleaders violated the takings clause. The statute at issue in *Webb's* provided that where a party deposits a sum with the clerk of the court the interest on that principal "shall be deemed income of" the clerk's office or the court. Were a state able, by court rule or statute, to establish ownership of interest in one other than the owner of the principal, this statute would have vitiated the Fifth Amendment. But *Webb's* held that the statute, analogous to Washington's IOLTA rule, violated the Takings Clause. [38]

"'[A] state by *ipse dixit*, may not transform private property into public property without compensation' simply by legislatively abrogating the traditional rule that 'earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property.' In other words, at least as to confiscatory regulations as opposed to those regulating the use of property, a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law." [39]

We applied *Phillips* in, *Schneider v. California Department of Corrections*. [40] There, prison inmates in California maintained small amounts of money in trust accounts, to purchase such personal convenience items as toothpaste at the prison canteens. A California statute provided that interest earned on inmates' money in the trust account would go to a state "inmate welfare fund" rather than to the individual inmate. Even though the state statute purported to eliminate any property interest the inmates might own to interest on their money, we held that under *Phillips*, "constitutionally protected property rights can-and often do-exist *despite* statutes ... that appear to deny their existence." [41]

We noted in *Schneider* that in *Phillips* and *Webb's*, the Supreme Court had held that "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law," [42] and both cases relied on the common law rule that "interest follows principal" "in the face of a contrary state statute." [43] To explain how this could be, we

---

**34.** *Id.* at 169, 118 S.Ct. 1925.

**35.** *Id.* at 170, 118 S.Ct. 1925.

**36.** *See id.* at 171, 118 S.Ct. 1925.

**37.** *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

**38.** *See id.* at 164–65, 101 S.Ct. 446.

**39.** *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 167, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**40.** *Schneider v. California Dep't of Corrections*, 151 F.3d 1194 (9th Cir.1998).

**41.** *Id.* at 1194.

**42.** *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 167, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**43.** *See id.*; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

explained in *Schneider* that *"Roth* stands not for a theory of plenary state control over the definition and recognition of compensable property interests,"[44] but rather that "there is, we think, a 'core' notion of constitutionally protected property," and a state's power to alter it by legislation "operates as a one-way ratchet of sorts," allowing the states to create new property rights but not to encroach on traditional property rights.[45] We recognized in *Schneider*, as the Supreme Court did in *Webb's* and *Phillips*, that "[w]ere the rule otherwise, States could unilaterally dictate the content of-indeed altogether opt out of-both the Takings Clause and the Due Process Clause simply by statutorily recharacterizing traditional property-law concepts."[46] Thus, for example, a state could obtain vast moneys for good works until everyone with large sums of money moved it out of state, by passing a law stating that all amounts in excess of $100,000 on deposit in any financial institutions are the property of the state. *Schneider* holds that the "common law pedigree" since 1749 of the rule that interest follows principal, and its "near-universal endorsement by American courts," establishes that "interest income of the sort at issue here is sufficiently fundamental that States may not appropriate it without implicating the Takings Clause."[47]

*Phillips'* and *Schneider's* rejection of positive state law as a means of avoiding the Takings Clause, disposes of the proposition that there is no taking because Washington, in its IOLTA program, has established as a matter of positive law that interest does not follow principal with respect to small and short term deposits in client's trust accounts. Texas, after all, had also established its IOLTA program as law, so if property rights in interest could be destroyed by state law in that

manner, *Phillips* had to come out the other way. A state cannot avoid the Fifth Amendment limitation on takings of property by legislating away the property right.

■ All that is left as a possible distinction of this case from *Phillips* is that Washington, unlike most common law jurisdictions, has not accepted the common law rule that interest follows principal. Exceptions to the rule will not establish a contrary view, because there were exceptions in Texas. Despite those exceptions, *Phillips* held that the client's ownership of the principal in the trust account still gave the client a property right in the interest. Defendants have to establish that Washington is an anomaly among common law jurisdictions, not merely by having some exceptions, but by not having accepted the virtually universal rule.

■ Not surprisingly, the case for Washington's anomalous status cannot be made. Most American jurisdictions adopted the common law in what are called "reception" statutes. Washington has a quite ordinary reception statute: "The common law, so far as it is not inconsistent with the Constitution and laws of the United States, or of the state of Washington nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state."[48] This ordinary reception of the common law was codified by the Territory of Washington in 1862, well before statehood, so no property owner in Washington has had to fear that by entering the state he or she was leaving behind the protection of the common law, including the rule that interest follows principal. In 1895, the Washington Supreme Court in *Tacoma School District v. Hedges*[49] applied the rule in holding that interest on delinquent

44. *Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1200 (9th Cir.1998).

45. *Id.*

46. *Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1201 (9th Cir.1998).

47. *Id.*

48. Wash. Rev.Code § 4.04.010 (2000).

49. *Tacoma School District v. Hedges*, 13 Wash. 69, 42 P. 522 (1895).

taxes should go to the school districts entitled to the principal amount of the taxes, not to the general funds of the counties collecting the taxes. A century later, the court applied the rule similarly in *City of Seattle v. King County*[50] based on the "common law principle that interest on public funds follows ownership of those funds."[51] Defendants note some Washington statutory exceptions to the common law rule,[52] but they are of no more significance than the Texas exceptions that the Court in *Phillips* deemed insufficient to overcome the Fifth Amendment significance of the common law rule. Statutes in derogation of the common law in a few limited and specialized circumstances do not work a general abrogation of the common law outside their scope.[53]

### C. Taking.

*Phillips* did not express a view on whether the Texas IOLTA law was a taking, nor on the amount of compensation due if it was,[54] because the circuit from which certiorari had been taken only addressed whether the interest was the client's property, and the petition for certiorari addressed only that question.[55]

Defendants argue that even if interest on client trust funds is the property of the clients, the IOLTA rule works no taking. The district court did not reach the question of whether there was a taking for which compensation was due because *Phillips* had not yet been decided by the Supreme Court when it ruled. The district judge relied on the one circuit court case then on the books,[56] which has since been superseded by *Phillips*.

▆▆ Plaintiffs presented evidence that for at least one of them, a measurable amount of money, about $20 in interest, was diverted to the Legal Foundation. *Phillips* holds that even where the client's interest on trust accounts "may have no economically realizable value to its owner, possession, control and disposition are nonetheless valuable rights that inhere in the property."[57]

To apply that concretely, a real estate purchaser might want interest on his money to go to his or her preferred charity, perhaps a church, a school, Mothers Against Drunk Driving, or the local Rescue Mission, rather than the Legal Foundation's preferred charity, legal services for indigents, even if that interest could not be realized by the real estate purchaser. Plaintiffs submitted evidence that at least some of them do in fact object to their interest going to the Legal Foundation's grantees.

---

**50.** *City of Seattle v. King County*, 52 Wash. App. 628, 762 P.2d 1152, 1153 (1988).

**51.** *Id.* at 1155.

**52.** *See* Wash. Rev.Code § 18.85.310(5) (real estate brokers must deposit nominal deposits in trust accounts, the interest to be used for low income housing and continuing education for real estate professionals); Wash. Rev.Code § 36.48.090 (interest on bail goes to county expenses, not those posting the bail); Wash. Rev.Code § 59.18.270 (landlords receive the interest on tenants' security deposits). These three statutes were adopted, respectively, in 1995, 1963, and 1973, long after the reception of the common law rule that interest follows principal. We have no occasion, of course, to consider the constitutionality of these provisions.

**53.** Sutherland Stat. Const. § 61.01–61.06 (5th Ed.). The old maxim that statutes in derogation of the common law are strictly construed may be incorrect as prescription or description of how such statutes are actually construed. But as a description of how legislatures promulgate laws, it is correct to say that by legislating on one matter, they do not abrogate all common law inconsistent with the new statute on other matters that were not even before them at the time.

**54.** *See Phillips v. Washington Legal Foundation*, 524 U.S. 156, 172, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**55.** *See id.* at n. 4.

**56.** *See Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962 (1st Cir.1993).

**57.** *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 170, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

■ Defendants argue that there has been no taking because there has been no physical invasion of tangible property. They rely on the Supreme Court's statement in *Penn Central Transportation Co. v. New York City*[58] that "[a] taking may more readily be found when the interference with property can be characterized as a physical invasion by the government."[59] But their argument uses the statement out of its context, which was regulation of real estate to preserve a historically and architecturally important building. The statement cannot be applied in the distinguishable context of money deposited in banks or invested in securities or money market funds. This would imply the nonsensical proposition that a taking would *less* readily be found if a state entirely confiscated people's money from their bank accounts or IRA's than if it installed a sign on their land.

■ Defendants seem to be arguing that the government can confiscate people's money without it being a taking compensable under the Fifth Amendment, based on cases where the government provided a service and charged a reasonable user fee for the service.[60] Taken out of the context of users' fees, the proposition is absurd. Unlike medieval England, most assets are now held in the form of fungible intangibles such as bank accounts, money market accounts, and securities. The Fifth Amendment protection of property would be eviscerated were we to construe confiscation of fungible intangibles as not amounting to a taking, as defendants urge. The Supreme Court drew precisely this distinction, between reasonable users' fees

and the interest on IOLTA accounts, in *Phillips*, noting that it "would be a different case" if the state were "imposing reasonable fees it incurs in generating and allocating interest income."[61] *Phillips* holds that *United States v. Sperry Corp.*,[62] the user fee case, has no application to complete "confiscation of respondents' interest income" by an IOLTA program where the funds are managed by banks and private individuals.[63]

Defendants make another, more appealing, argument from *Penn Central* that the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations."[64] The argument is that, because the plaintiffs could not have realized any money from the IOLTA funds, the economic impact is nonexistent, and because the IOLTA rule was in effect when they acted, the IOLTA rule could not have interfered with their expectations.

■ This argument fails on several independent grounds. First, the "economic impact" test is articulated in *Penn Central* in the context of regulation of the use of real estate, not deprivation in its entirety of any property. The point of the economic impact test in *Penn Central* is to distinguish government regulations of the owner's use of property permissible under its police power from those that go too far, requiring the government to compensate the owner for taking his property. That distinction is not necessary or appropriate where the government entirely appropri-

**58.** *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

**59.** *Id.* at 124, 98 S.Ct. 2646.

**60.** *See e.g., United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989).

**61.** *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 171, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**62.** *See also* our user's fee decision in *Commercial Builders of Northern California v. City of Sacramento*, 941 F.2d 872 (9th Cir.1991).

**63.** *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 171, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**64.** *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

ates a sum of money belonging to a private individual. The economic impact test would have relevance if the IOLTA rule merely regulated how the client used his interest, or where the interest was kept, or for how long. But that is not the case. The IOLTA rule entirely appropriates the interest on the client's principal in a trust account, so the distinction between regulation under the police power and a taking subject to Fifth Amendment protection is not affected by the economic impact.

This analysis is compelled by *Loretto v. Teleprompter Manhattan CATV Corp.*[65] There, a city required landlords to allow cable television companies to put cables on their roofs. The Court held that this permanent physical occupation of a portion of roof space was a "taking" "without regard to the public interests that it may serve,"[66] and without regard to the "minimal economic impact on the owner."[67] The Court held that the multi-factor test in *Penn Central* does not apply to a permanent physical occupation, as was the case for those parts of the roof on which the cables were mounted.[68] *Phillips* applied *Loretto*, in the context of IOLTA interest rather than physical invasion of real property.[69] And *Phillips* interpreted *Loretto* to mean that property was "taken" "even when infringement of that right arguably *increased* the market value of the property at issue."[70] Thus, says *Phillips*, drawing an analogy to IOLTA interest, "the government may not seize rents received by the owner of a building simply because it can prove that the costs incurred in collecting the rents exceed the

amount collected."[71] The Court in *Phillips* also expressly rejected the argument that because federal tax and banking regulations are what enables IOLTA to generate interest, there is no property right, on the ground that "the State does nothing to create value; the value is created by respondent's funds."[72] When the government permanently appropriates all of the interest on IOLTA trust funds, that is a *per se* taking, as when it permanently appropriates by physical invasion of real property.[73]

Second, it is not quite correct to say that IOLTA as structured does not deprive clients of any money. The rule says that in determining whether to deposit money held in trust into the IOLTA account or an account where the client will receive the interest, a lawyer must consider "only whether the funds to be invested could be utilized to provide a positive net return to the client," based on the interest to be earned while the funds "are expected to be" deposited, and the various expenses including lawyers' fees for administering interest payable to the client.[74] This leaves two ways in which, as a practical matter, the client may lose an economically significant amount of interest. One, probably quite common, is where the funds "are expected to be" deposited for a much shorter period than they actually are. For example, disbursement to a client may be delayed because a physician who treated him in exchange for a pro tanto assignment of settlement proceeds calls to say that another bill is coming. A closing on a

**65.** *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

**66.** *Id.* at 426, 102 S.Ct. 3164.

**67.** *Id.* at 435, 102 S.Ct. 3164.

**68.** *See id.* at 432, 102 S.Ct. 3164.

**69.** *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 169–70, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) (emphasis in original).

**70.** *Id.* at 170, 118 S.Ct. 1925.

**71.** *Id.* at 170, 118 S.Ct. 1925.

**72.** *Id.* at 171, 118 S.Ct. 1925.

**73.** *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

**74.** *Washington Rules of Professional Conduct* Rule 1.14(3). The rule for closing officers, *Washington Admission to Practice Rules* Rule 12.1(b)(3), is analogous, except that "cost of closing officer's services" is substituted for "cost of lawyer's services."

house may be delayed because the engineer whose report the bank needs catches the flu and finishes the report a couple of weeks late. All sorts of reasons intervene so that expected one day deposits, originally thought to produce interest less than the anticipated expense of paying it to the client, turn into deposits for a few weeks.

The second way a client may lose interest is that the costs of lawyers' and closing officers' services are overestimated. As a practical matter, the lawyers and closing officers have a substantial incentive not to be bothered with crediting clients with their interest. It is therefore in their interest to say of almost all routine trust deposits that no significant interest will accrue and to place the money into the IOLTA account. But a client, whether out of desire that he or she get every penny coming to them, a feeling of getting "nickeled and dimed," or an objection to contributing money to lawyers' and judges' favorite charity, may think it is worth having a lawyer spend $19.95 worth of time to get the client $20 in interest. Also, the amount of time and trouble involved in collecting, allocating, and distributing interest to clients depends on how often it is done. If done once, it is probably a costly nuisance. If done frequently, it may become delegable to non-professional staff using off the shelf software.

D. Remedies.

■ Defendants argue that even if the interest is the client's property, and even if the IOLTA rule effects a taking, the Fifth Amendment nevertheless affords no remedy because the "just compensation" is zero. On this point, which the district court did not reach, a remand is necessary. The Fifth Amendment does not prohibit the taking of private property for public use; it allows it.[75] What it prohibits is the taking of private property for public use "without just compensation." [76]

■ Defendants argue that no equitable relief is available to enjoin a taking of private property for public use, citing *Ruckelshaus v. Monsanto.*[77] *Monsanto* does not preclude all equitable relief related to a taking, but it does prevent a court in most circumstances from enjoining the taking itself. Even though the Washington IOLTA rule is a taking of private property for public use from clients of lawyers and closing officers, that does not necessarily entitle or require a district court to enjoin operation of the rule. The clients are entitled to just compensation, not to prevention of the taking, just as they would be if the state were taking their real estate to build a highway. Plaintiffs' prayer for relief seeks "reimbursement" of the interest taken from them. "Reimbursement" is not a correct form of relief, because plaintiffs never had possession of the interest that was taken from them, and, as explained below, reimbursement may be an incorrect measure of "just compensation."

■ *Monsanto* does not address all the equitable relief demanded, only the taking itself. Though they cannot enjoin the government from taking their interest for public use, plaintiffs are entitled to a declaratory judgment that taking their interest for public use without paying them just compensation, under the IOLTA rule, violates the Fifth Amendment. Plaintiffs also seek an injunction prohibiting the Washington Supreme Court from taking disciplinary action against limited practice officers (the closing officers escrow companies employ) for refusing to deposit clients' money into the IOLTA account, or from conditioning their licenses on complying with IOLTA rules. We do not decide whether such an injunction would be appropriate, because the district court has not yet considered the issue, but if it would otherwise be appropriate, *Monsanto* would not bar an injunction. *Monsanto* prevents

---

**75.** *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Macri v. King County,* 126 F.3d 1125 (9th Cir.1997).

**76.** U.S. Const. amend. V.

**77.** *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

courts from enjoining takings. This equitable relief would not enjoin takings, but would instead be addressed to saving the jobs of title and escrow company employees caught between the IOLTA rules and employers who do not want to employ anyone who will comply with the IOLTA rules.

■ Defendants correctly argue that the measure of just compensation is not the value that the government gains, but rather the value that the person whose property was taken loses.[78] Ordinarily if money is taken, it comes to the same thing, but not necessarily in this case. The evidence before us allows for differing conclusions, so there is a genuine issue of fact on this record. It is possible that the interest gained by the defendants exceeds the amount of the loss by the clients.

■ Plaintiffs' submissions include what the escrow companies call "IOLTA fees" charged to customers whose money is put into the IOLTA account. These fees and the affidavits explaining them support an inference that the clients are harmed financially by the IOLTA program, but the "IOLTA fees" do not measure the loss. The IOLTA fees are not charged by IOLTA, but by the title and escrow companies. Before IOLTA the banks previously received the benefit of the "float," that is, the interest-free loans lawyers gave them of their clients' money, and escrow companies of their customers' money, when it was held in trust accounts. A bank account is a loan of money by the depositor to the bank.[79] Before IOLTA, the banks "kicked back" part of this benefit of this interest-free loan to the title and escrow companies. The customers who put the funds in escrow, and had equitable title to them, received nothing. Now that IOLTA receives the benefit of the "float" instead of the banks, the banks no longer share it with the title and escrow companies, in the form of credits against bank charges. So the title and escrow companies charge customers an amount they refer to as "IOLTA fees," not based on any fees charged by IOLTA, but rather on their loss of benefits they previously shared with the banks from interest-free deposits of their customers' money. Because the interest is property taken from the customers, not the title and escrow companies, just compensation is due to the customers, not the title and escrow companies, and is measured by the loss to the customers, not the title and escrow companies. The significance of the mislabeled "IOLTA fees" and loss of bank credits is that it shows some compensable value was there, even though the value was being retained by the title and escrow companies rather than the customers whose money they took in trust.

The Court in *Phillips* drew a distinction that implies the proper resolution of the just compensation measure (and with it, the constitutionally permissible form of an IOLTA program). *Phillips* says that the taking of interest on trust accounts "would be a different case" if the state were "imposing reasonable fees it incurs in generating and allocating interest income."[80] *Phillips* cites *Sperry*[81] in reference to this "different case" IOLTA plan. In *Sperry*, the government caused a fund to be generated for victims of Iranian revolutionary confiscations and charged a fee of 2% for expenses incurred in connection with the arbitration of claims and the maintenance of the fund.[82] By analogy with the Iranian

---

**78.** *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979); *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725 (1910).

**79.** *See IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1422 (9th Cir.1997).

**80.** *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 171, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**81.** *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989).

**82.** *See id.* at 57, 110 S.Ct. 387.

confiscation fund, it may be the case that but for the efforts of the Washington Bar and Supreme Court, the banks and escrow companies would still get the benefit of the clients' and customers' money deposited into their trust accounts. For their service in "generating and allocating interest income," the Legal Foundation may be justified in "imposing reasonable fees" analogous to the fees the government charged on the Iranian confiscation fund. There have to be some expenses, for the clerical and administrative efforts in managing the flow and accounting for IOLTA funds. The IOLTA program managers have to pool the clients' moneys deposited into trust and make the arrangements with the banks, or there is no interest.

Just as a client is not entitled to the full amount that a lawyer collects for him, but only that amount less the lawyer's reasonable expenses and fees,[83] so just compensation for interest taken by IOLTA after IOLTA causes the interest fund to exist is something less than the amount of the interest. This analogy to the restitution theory applicable to lawyers' fees for producing a common fund is only partial. The principal, not the lawyers' efforts, produces the interest.[84] But there is some analogy to common fund cases, and to the Iranian confiscations fund in *Sperry*, because there would be no interest that could flow to the individual clients but for substantial administrative and clerical efforts to administer the IOLTA program, both to assure that lawyers' and escrow companies' trust funds went into the pooled accounts, and to distribute interest to clients out of pooled accounts.[85]

Even though when funds are deposited into IOLTA accounts, the lawyers expect them to earn less than it would cost to distribute the interest, that expectation can turn out to be incorrect, as discussed

above. Several hypothetical cases illustrate the complexities of the remedies, which need further factual development on remand. Suppose $2,000 is deposited into a lawyer's trust account paying 5% and stays there for two days. It earns about $.55, probably well under the cost of a stamp and envelope, along with clerical expenses, needed to send the $.55 to the client. In that case, the client's financial loss from the taking, if a reasonable charge is made for the administrative expense, is nothing. The fair market value of a right to receive $.55 by spending perhaps $5.00 to receive it would be nothing. On the other hand, suppose, hypothetically, that the amount deposited into the trust account is $30,000, and it stays there for 6 days. The client's loss here would be about $29.59 if he does not get the interest, which may well exceed the reasonable administrative expense of paying it to him out of a common fund. It is hard to see how just compensation could be zero in this hypothetical taking, even though it would be in the $2,000 for 2 days hypothetical taking. It may be that the difference between what a pooled fund earns, and what the individual clients and escrow companies lose, adds up to enough to sustain a valuable IOLTA program while not depriving any of the clients and customers of just compensation for the takings. This is a practical question entirely undeveloped on this record. We leave it for the parties to consider during the remedial phase of this litigation.

### E. First Amendment Claim

Plaintiffs claim that the IOLTA program violates the First Amendment because it forces clients of lawyers and customers of escrow companies to contribute their interest money to groups such as legal services programs asserting public positions with

---

**83.** See *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir.1989).

**84.** See *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 168, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).

**85.** An additional detail not clear from the record as it stands is whether the interest could flow to clients, or only to charities selected by clients, under the restrictions applicable to financial institutions in which trust funds could prudently be pooled.

which they disagree. Because plaintiffs prevail on their Fifth Amendment claim, and because the district court did not reach the First Amendment claim, we do not reach the First Amendment claim.

### III CONCLUSION

IOLTA programs spread rapidly because they were an exceedingly intelligent idea. Money that lawyers deposited in bank trust accounts always produced earnings, but before IOLTA, the clients who owned the money did not receive any of the earnings that their money produced. IOLTA extracted the earnings from the banks and gave it to charities, largely to fund legal services for the poor. That is a very worthy purpose. But as *Phillips* reminds us, the interest belongs to the clients. It does not belong to the banks, or the lawyers, or the escrow companies, or the state of Washington. If the clients' money is to be taken by the State of Washington for the worthy public purpose of funding legal services for indigents or anything else, then the state of Washington has to pay just compensation for the taking. That serves the purpose of imposing the costs on society as a whole for worthwhile social programs, rather than on the individuals who have the misfortune to be standing where the cost first falls.[86]

In sum, we hold that the interest generated by IOLTA pooled trust accounts is property of the clients and customers whose money is deposited into trust, and that a government appropriation of that interest for public purposes is a taking entitling them to just compensation under the Fifth Amendment. But just compensation for the takings may be less than the amount of the interest taken, or nothing, depending on the circumstances, so determining the remedy requires a remand.

REVERSED and REMANDED.

---

**86.** *See Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).