151 F.3d 1194
 98 Cal. Daily Op. Serv. 6089, 98 Daily Journal
D.A.R. 8471
Paul John SCHNEIDER; Todd Lewis Ashker; Brian Devlin
Healy; Steve Olivares; Dwayne McElwee; Earl Wilson;
Anthony Lee Likai; Daniel Demarco; Michael Ray Hanline;
Katherine Caldwell; Theresa Fredericks, and Rick
Terflinger, Plaintiffs-Appellants,*
v.
CALIFORNIA DEPARTMENT OF CORRECTIONS; James Gomez, in His
Capacity as Former Director of the Department of
Corrections, Defendants-Appellees.
 No. 97-15820.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 12, 1998.
Submission Deferred March 23, 1998.
Resubmitted July 1, 1998.
Decided Aug. 4, 1998.
 
 Herman A.D. Franck V, Franck & Associates, San Francisco, CA, for plaintiffs-appellants.
 Allen R. Crown, Deputy Attorney General, San Francisco, CA, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Susan Illston, District Judge, Presiding. D.C. No. CV-96-01739-SI.
 Before: SNEED, WOOD,** and O'SCANNLAIN, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We are asked to decide whether the California Department of Corrections' policy of withholding from prisoners the interest that is earned on their inmate trust accounts contravenes the Takings Clause of the Fifth Amendment.
 
 
 2
 * The appellants are inmates currently and formerly incarcerated at several California state prisons. For security reasons, inmates are not permitted under California law to possess money while in prison. See 15 C.C.R. § 3006(b). The California Department of Corrections ("State") has therefore established two separate types of trust accounts into which prisoners may place personal funds during their incarceration. The first, an Inmate Passbook Savings Account ("IPSA"), is administered by Bank of America, and pays interest directly to the inmate. The second, an Inmate Trust Account ("ITA"), does not pay interest to the inmate. Each prisoner has the option of authorizing the State to establish and maintain an ITA on his behalf, but he is not required to do so. See 15 C.C.R. § 3075.1(d)(3) ("CDC Form 345"). There are, however, two obvious incentives to establish an ITA. First, in order to set up an IPSA interest-bearing account, an inmate is required to maintain an ITA with a minimum balance of $25.00. Second, and more significantly, only those funds placed into an ITA are available to the inmate for purchases in the prison canteen, such as soap and toothpaste. CDC Form 345, which a prisoner must sign in order to set up an ITA, specifically provides: "I authorize the Director of Corrections to maintain a trust fund account in my name, thus enabling me to make purchases from the canteen. I also understand that if I do not complete and sign this form, my canteen privileges will be lost." Id.
 
 
 3
 There is, on the other hand, also a distinct disincentive to maintain an ITA. The California Penal Code specifies that any interest earned on inmate funds placed in ITAs shall be allocated, not to the prisoners themselves, but rather to the "Inmate Welfare Fund." See Cal.Penal Code § 5008. In fact, in signing CDC Form 345--the same form that sanctions the establishment of an ITA--a prisoner expressly "authorize[s] any interest earned on monies held for [him] in such trust [to] be deposited into the Inmate Welfare Fund." 15 C.C.R. § 3075.1(d)(3). According to California law, funds placed in the Inmate Welfare Fund "shall be used for the benefit, education, and welfare of inmates of prisons and institutions under the jurisdiction of the Department of Corrections," including but not limited to the establishment and maintenance of prison canteens and hobby shops. Cal.Penal Code § 5006.
 
 
 4
 To summarize, then, an inmate must maintain an ITA in order to purchase items in the prison canteen. However, as a matter of California statutory law, the inmate cannot himself collect any interest earned on funds placed in his ITA. A prisoner, as the appellants put it, "has one choice: canteen or interest. Not both."
 
 
 5
 The prisoners who are parties to this controversy filed suit in federal district court pursuant to 42 U.S.C. § 1983, arguing that the State's policy of not paying interest on inmates' ITAs constitutes a taking of private property for public purposes in violation of the Fifth and Fourteenth Amendments. Rejecting the prisoners' contention, the district court dismissed their suit without leave to amend:
 
 
 6
 [T]he Court finds that inmates in California do not have a protected property interest in the interest income earned on Inmate Trust Accounts and that they are not deprived of earning interest on their funds because they can elect to place their money in a Passbook Savings Account. Therefore, the Court concludes that plaintiffs have not stated, and cannot state, a claim for violation of the Fifth Amendment Takings Clause.
 
 
 7
 Schneider v. California Dep't of Corrections, 957 F.Supp. 1145, 1149 (N.D.Cal.1997). After the district court denied the prisoners' application for leave to file a motion for reconsideration, the prisoners timely appealed.
 
 II
 
 8
 A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is a ruling on a question of law that we review de novo. See Cohen v. Stratosphere Corp., 115 F.3d 695, 700 (9th Cir.1997). In examining the district court's Rule 12(b)(6) dismissal, we must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party." Warshaw v. Xoma Corp., 74 F.3d 955, 957 (9th Cir.1996). As the Supreme Court has stated, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Rather, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
 
 
 9
 Our review in this case is even more searching than usual because the district court dismissed the prisoners' complaint without leave to amend. "[D]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir.1996).
 
 III
 
 10
 The State contends, as an initial matter, that the funds deposited in the inmates' ITAs never actually accrued any interest. Because there was no interest earned, the State maintains, there was none to be unconstitutionally "taken."
 
 
 11
 The State is not required by California law to place ITA monies in an interest-bearing account. Rather, the Penal Code merely provides that the State "may deposit such funds in interest-bearing bank accounts" and that, if it does so, it "shall deposit the interest or increment accruing on such funds in the Inmate Welfare Fund." Cal.Penal Code § 5008 (emphasis added). Whether, as a factual matter, the funds deposited in the ITAs involved in this case actually generated interest that was withheld from the inmates, or instead failed to accrue interest at all, is a subject of some doubt. Indeed, counsel for each side, when asked at oral argument whether the prisoners' ITA funds actually netted any interest, offered the same response: "I don't know." Somewhat surprisingly, on its face, the prisoners' own complaint suggests that the ITAs here at issue might not have earned any interest. Although, in places, the complaint refers alternatively to "the actual and/or constructive accrual of interest" (indicating that the inmates were themselves uncertain whether their funds actually generated interest), in others, it refers to the ITA as "purportedly [being] a non-interest bearing account" and as having a "non-interest-bearing" quality. Moreover, attached as Exhibit B to the inmates' complaint is a copy of a denial of an internal prison administrative appeal, signed by prison officials, which states quite specifically that "Inmate Trust funds are deposited in a non-interest bearing account; and therefore, there is no interest earned to be paid to the inmates."[1]
 
 
 12
 Ordinarily, the face of the plaintiffs' complaint, see Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir.1996), and the exhibits attached thereto, see Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir.1995), would control the Rule 12(b)(6) inquiry. However, because the district court below dismissed the inmates' action without leave to amend, the situation with which we are presented is somewhat different. Pursuant to well-established circuit precedent, "dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." Chang, 80 F.3d at 1296 (emphasis added). Here, the prisoners' complaint assuredly could have been cured by an appropriate amendment. Specifically, the inmates could have alleged (if true) that the ITA funds did in fact accrue interest, but that the interest was paid to the Inmate Welfare Fund pursuant to California Penal Code § 5008 rather than to the inmates themselves.[2]
 
 
 13
 There is but one circumstance under which such an amendment would not have saved the prisoners' complaint, namely, if the confiscation and redistribution of actually-accrued interest on ITA accounts would not violate the Takings Clause. Both the district court in its order and the State on appeal concluded precisely that. In its decision, the district court deemed the parties' factual dispute over the accrual of interest to be of no particular constitutional moment: "[W]hether interest is actually earned on these funds does not affect the constitutional analysis." Schneider, 957 F.Supp. at 1147 n. 5. The court simply assumed for the purposes of its decision that the ITA funds did generate interest. It nonetheless concluded that, in view of Penal Code § 5008, "inmates in California do not have a protected property interest in the interest income earned on [ITAs]." Id. at 1149. Consequently, it held that "plaintiffs have not stated, and cannot state, a claim for violation of the Fifth Amendment Takings Clause." Id. In its brief to this court, the State agreed:
 
 
 14
 Even if there were interest paid on the inmate trust accounts, the law of the state of California requires that the interest be deposited into the Inmate Welfare Fund for the benefit of all inmates rather than deposited to the individual inmates' trust accounts. Thus, there is no property interest belonging to plaintiffs in the interest income, actual or imagined, from the inmate trust accounts.
 
 
 15
 Appellees' Opening Brief at 6 (emphasis added). Hence, in the estimation of both the district court and the State on appeal, the resolution of the prisoners' Takings Clause claim simply boils down to the definition of compensable "property interests." Because the inmates possess no such interest, the district court concluded and the State argues on appeal, they cannot state a claim under the Takings Clause of the Fifth Amendment.
 
 
 16
 In view of the stringency of circuit law regarding Rule 12(b)(6) dismissals without leave to amend, for the purposes of this appeal, we shall assume, as did both the district court and the State on appeal, that interest did, in fact, accrue on the prisoners' ITAs, and that the State deposited the interest income into the Inmate Welfare Fund rather than distributing it to the prisoners. On the basis of that assumption, we turn to review the district court's conclusion that the prisoners possessed no constitutionally protected property interest in actually-acquired interest income.
 
 IV
 
 17
 Pursuant to the Takings Clause of the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Although originally intended as a limitation only on the federal government, see Barron v. Mayor & City Council of Baltimore, 32 U.S. (7 Pet.) 243, 250-51, 8 L.Ed. 672 (1833), the Takings Clause has long been held to apply to the States through the Due Process Clause of the Fourteenth Amendment, see Chicago, Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 239, 17 S.Ct. 581, 41 L.Ed. 979 (1897). In order to state a claim under the Takings Clause, a plaintiff must first demonstrate that he possesses a "property interest" that is constitutionally protected. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1000-01, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); Penn Central Transp. Co. v. New York, 438 U.S. 104, 125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Only if he does indeed possess such an interest will a reviewing court proceed to determine whether the expropriation of that interest constitutes a "taking" within the meaning of the Fifth Amendment.
 
 
 18
 * The inmates first argue that they are entitled to relief on the basis of our decision in Tellis v. Godinez, 5 F.3d 1314 (9th Cir.1993). In Tellis, we reversed a district court's grant of summary judgment for prison officials in a suit brought by a state inmate alleging that the prison had violated the Takings Clause by withholding interest earned on funds in his personal prison bank account. See id. at 1317. We premised our holding on a Nevada statute which specifically provided that "[t]he interest and income earned on the money in the [prisoner's] fund, after deducting any applicable charges, must be credited to the fund." Nev.Rev.Stat. § 209.241. We concluded that "[t]he plain language of this section ... does create a protected property interest in interest and income actually earned on money deposited in the prisoners' personal property fund." Tellis, 5 F.3d at 1317.
 
 
 19
 Here, there is no California analogue to the Nevada statute that might be deemed to create a property interest cognizable under the Takings Clause. Indeed, California statutory law suggests precisely the opposite conclusion. California Penal Code § 5008 states, in terms both clear and mandatory, that the State "shall deposit the interest or increment accruing on [prisoners' ITA] funds in the Inmate Welfare Fund." Cal.Penal Code § 5008. The Penal Code neither requires nor permits the payment of ITA interest to the prisoners themselves. Consequently, not only does California statutory law not create a property interest in the inmates, it appears to deny the existence of any such interest. Tellis is thus of little help to the inmates.
 
 B
 
 20
 According to the State, the conclusion that § 5008 does not create a property interest in the inmates' interest income ends the constitutional inquiry. We emphatically disagree. Although an explicit statutory provision may indeed be a sufficient condition to the creation of a constitutionally cognizable property interest, see, e.g., Tellis, 5 F.3d at 1317, it assuredly is not a necessary one. Notwithstanding the State's protestations to the contrary, property rights can--and often do--exist wholly independently of statutes recognizing them as such. Indeed, as the Supreme Court's decisions in Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), and Phillips v. Washington Legal Foundation, --- U.S. ----, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), demonstrate, constitutionally protected property rights can--and often do--exist despite statutes, such as § 5008, that appear to deny their existence. In Webb's, the Supreme Court reviewed under the Takings Clause a Florida statute that expressly directed a county to retain interest that had accrued on an interpleader fund deposited by a private party into the registry of the county court. The state statute under consideration, Fla. Stat. § 28.33, provided, in pertinent part, that "[a]ll interest accruing from moneys deposited shall be deemed income of the office of the clerk of the circuit court investing such moneys." Notwithstanding § 28.33, however, which seemed quite explicitly to vest the county with ownership of the interest earned, the Court held that the county was not entitled to the earnings. Rather, the Court invoked the "usual and general rule ... that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." Webb's, 449 U.S. at 162, 101 S.Ct. 446. The Court then concluded that "[t]he earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property." Id. at 164, 101 S.Ct. 446. As for the express command of § 28.33, the Court declared:
 
 
 21
 [A] State, by ipse dixit, may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Takings Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against the arbitrary use of governmental power.
 
 
 22
 Id.
 
 
 23
 Just last Term, in Phillips, the Supreme Court reaffirmed its commitment to the "interest follows principal" rule as a constitutionally relevant aspect of Takings Clause jurisprudence. There, the Court considered whether interest earned on client trust funds held by lawyers pursuant to Interest on Lawyers Trust Account ("IOLTA") programs is a property right cognizable under the Takings Clause. According to the Texas IOLTA regulations, which were the immediate subject of the Supreme Court's attention in Phillips, interest earned on certain client funds held by lawyers was to be paid, not to the clients themselves, but to foundations that financed legal services for the indigent. See Texas State Bar Rule, Art. XI, §§ 3-4; Texas IOLTA Rule 9(a). The Court nonetheless concluded that participating attorneys' clients possessed a protected property interest in the earnings. In so doing, the Court in Phillips echoed its earlier decision in Webb's. The Court observed that the "interest follows principal" rule "has been established under English common law since at least the mid-1700's," Phillips, --- U.S. at ----, 118 S.Ct. at 1930 (citing Beckford v. Tobin, 1 Ves. Sen. 308, 310, 27 Eng. Rep. 1049, 1051 (Ch. 1749) ("[I]nterest shall follow the principal, as the shadow the body.")), and "has become firmly embedded in the common law of the various States," id. --- U.S. at ----, 118 S.Ct. at 1930 & n. 5 (collecting cases). As it had in Webb's with regard to the Florida interpleader-fund statute, the Court in Phillips refused to accord the Texas IOLTA rules--which purported to divest clients of ownership of the interest income in IOLTA accounts--any talismanic significance. Rather, the Court reiterated that "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law." Id. --- U.S. at ----, 118 S.Ct. at 1931. The Webb's and Phillips decisions are therefore similar to one another (and germane to this case) in a critical respect: In both cases, the Court relied, in the face of a contrary state statute, upon the traditional common law rule that "interest follows principal" in recognizing a protected property interest in earned interest income.
 
 
 24
 In support of its theory that "the interest [on ITA funds] belongs to the persons or entities which state law designates as owning the interest," the State points to Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In Roth, the Supreme Court observed:
 
 
 25
 Property interests ... are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.
 
 
 26
 Id. at 577, 92 S.Ct. 2701 (emphasis added). The State's reliance upon Roth, however, is misplaced. Understood in proper context, it is clear that Roth stands not for a theory of plenary state control over the definition and recognition of compensable property interests, as the State assumes, but for a much more modest proposition. Roth was a so-called "new property" case; in it, the Court considered the circumstances under which state law might serve to elevate certain nontraditional forms of property--such as public employment, welfare assistance, state contracts and licenses, and other government largesse--to constitutional status.[3] The Roth Court's recognition of the unremarkable proposition that state law may affirmatively create constitutionally protected "new property" interests in no way implies that a State may by statute or regulation roll back or eliminate traditional "old property" rights. As the Supreme Court has made clear, "the government does not have unlimited power to redefine property rights." See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 439, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Rather, there is, we think, a "core" notion of constitutionally protected property into which state regulation simply may not intrude without prompting Takings Clause scrutiny.[4] The States' power vis-a-vis property thus operates as a one-way ratchet of sorts: States may, under certain circumstances, confer "new property" status on interests located outside the core of constitutionally protected property, but they may not encroach upon traditional "old property" interests found within the core. See Richard H. Fallon, Jr., Some Confusions About Due Process, Judicial Review, and Constitutional Remedies, 93 Colum. L.Rev. 309, 329 (1993). Were the rule otherwise, States could unilaterally dictate the content of--indeed, altogether opt out of--both the Takings Clause and the Due Process Clause simply by statutorily recharacterizing traditional property-law concepts.[5]
 
 
 27
 We need not attempt to mark out with any precision the contours of property's "core" meaning. It is sufficient, we think, to say that the core is defined by reference to traditional "background principles" of property law. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1029-30, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); cf. Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 17.5, at 627 (2d ed. 1992) ("Certainly all of the traditional forms of real and personal property fall with [the definition of 'property']."). The "interest follows principal" rule's common law pedigree, see, e.g., Beckford v. Tobin, 1 Ves. Sen. 308, 310, 27 Eng. Rep. 1049, 1051 (Ch. 1749), and near-universal endorsement by American courts--including California's, see, e.g., Breda Costruzioni Ferroviarie v. Los Angeles County Metro. Trans. Auth., 56 Cal.App.4th 1433, 66 Cal.Rptr.2d 416, 419-20 (1997); Pomona City Sch. Dist. v. Payne, 9 Cal.App.2d 510, 50 P.2d 822, 823 (1935)--leave us with little doubt that interest income of the sort at issue here is sufficiently fundamental that States may not appropriate it without implicating the Takings Clause.
 
 C
 
 28
 California Penal Code § 5008 does not immunize the State's policy of withholding from prisoners the interest earned on their ITAs against constitutional attack. Rather, we hold that, notwithstanding § 5008, the California inmates--like the creditors in Webb's and the clients in Phillips--possess a constitutionally cognizable property interest that triggers Takings Clause scrutiny.
 
 V
 
 29
 In view of the unique procedural posture of this case, our holding is necessarily a narrow one. We simply hold that the district court erred insofar as it concluded that "inmates in California do not have a protected property interest in the interest earned on [ITAs]" and dismissed the prisoners' complaint without leave to amend on that basis.
 
 
 30
 On remand, the district court shall permit discovery to determine whether or not interest actually accrues on the prisoners' ITA funds. If the court concludes either that interest income is, in fact, earned or that an award of "constructive interest" is appropriate, it shall permit the prisoners to amend their complaint accordingly and to proceed with their Takings Clause claims against the State.
 
 
 31
 REVERSED and REMANDED with instructions.
 
 
 
 *
 After oral argument, prisoners Ricardo Leyva and Thomas Kleve withdrew as Plaintiffs-Appellants
 
 
 **
 The Honorable Harlington Wood, Jr., Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 Perhaps recognizing that their complaint was (at best) ambiguous, the inmates insisted in their memorandum to the district court opposing the State's motion to dismiss that their ITAs do indeed earn interest but that the interest is credited to the Inmate Welfare Fund rather than to them as individual prisoners. The "new" allegations contained in the inmates' opposition motion, however, are irrelevant for Rule 12(b)(6) purposes. In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss. See Harrell v. United States, 13 F.3d 232, 236 (7th Cir.1993); see also 2 Moore's Federal Practice, § 12.34 (Matthew Bender 3d ed.) ("The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)."). The focus of any Rule 12(b)(6) dismissal--both in the trial court and on appeal--is the complaint. This case is no exception. Here, the face of Exhibit B, which was attached to the prisoners' complaint, stated, in no uncertain terms, that "Inmate Trust funds are deposited in a non-interest bearing account; and therefore, there is no interest earned to be paid to inmates."
 
 
 [2]
 The inmates maintain that whether or not interest was actually earned on their ITA funds is irrelevant. They contend that, under the "constructive interest" doctrine, the "interest is earned whether or not it is actually earned; th[e] interest will be imputed constructively in the event that there were no interest charges actually placed." In support of their claim, the prisoners point to language in United States v. $277,000 U.S. Currency, 69 F.3d 1491 (9th Cir.1995), to the effect that "[a]ll financial assets in the hands of the government are a means by which the government does not have to borrow equivalent funds." Id. at 1495. They urge that, under $277,000 U.S. Currency, the amount in interest payments that the California government saves by not borrowing the principal amount from some other source should be credited to the inmates' principal as "constructive interest."
 Because we are unable to ascertain either from the face of the inmates' complaint or from the relatively meager record on appeal precisely how the prisoners' principal was deployed (i.e., whether or not it was placed in an interest-bearing account and, if not, whether or not California used the money in any other way to improve its own fiscal condition), we express no opinion as to the applicability of the "constructive interest" doctrine to the prisoners' claim. The district court may explore the matter on remand.
 
 
 [3]
 See Charles Reich, The New Property, 73 Yale L.J. 733 (1964); see also Goldberg v. Kelly, 397 U.S. 254, 261-63 & n. 8, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ("It may be realistic today to regard welfare entitlements as more like 'property' than a 'gratuity.' ")
 
 
 [4]
 Concurring in PruneYard Shopping Center v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), the late Justice Marshall sounded a similar theme. His comments bear repeating at some length:
 I do not understand the Court to suggest that rights of property are to be defined solely by state law, or that there is no federal constitutional barrier to the abrogation of common-law rights by Congress or a state government. The constitutional terms "life, liberty, and property" do not derive their meaning solely from the provisions of positive law.... Quite serious constitutional questions might be raised if a legislature attempted to abolish certain categories of common-law rights in some general way. Indeed, our cases demonstrate that there are limits on governmental authority to abolish "core" common-law rights, including rights against trespass, at least without a compelling showing of necessity or a provision for a reasonable alternative remedy.
 Id. at 93-94, 100 S.Ct. 2035 (footnotes omitted).
 
 
 [5]
 For instance, could a State, consistently with the Takings Clause, statutorily craft its property law in such a manner that deprived car-owners of their rights in their automobiles? Homeowners of their rights in their houses? The questions are so absurd as to answer themselves, see Henry Paul Monaghan, Of "Liberty" and "Property", 62 Cornell L.Rev. 405, 440 (1977), and serve to elucidate the constitutional limits of state authority over the definition of property rights