**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DYER L. VANDEVERE; JOHN
MCCOMBS; GARY HOLLIER; and
JOHN N. JENT,
              *Plaintiffs-Appellants,*          No. 09-35957

              v.                                 D.C. No.
                                                 3:07-cv-00083-TMB
DENBY LLOYD, Commissioner of
the Fisheries and the Alaska                     OPINION
Department of Fish & Game, in
his official capacity,
              *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted
May 4, 2011—Anchorage, Alaska

Filed July 11, 2011

Before: Arthur L. Alarcón, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Graber

9217

## COUNSEL

Arthur S. Robinson, Robinson & Associates, Soldotna, Alaska, for the plaintiffs-appellants.

Lance B. Nelson, Senior Assistant Attorney General, Natural Resources Section, Anchorage, Alaska, for the defendant-appellee.

## OPINION

GRABER, Circuit Judge:

Plaintiffs Dyer L. Vandevere, John McCombs, Gary Hollier, and John Jent fish commercially for salmon in the waters of Alaska's Upper Cook Inlet. State-issued entry permits and shore fishery leases allow them to fish there. After Alaska promulgated regulations that shorten the fishing year and limit the number of salmon that commercial fishers may harvest, Plaintiffs brought this action against Defendant Denby Lloyd, who is the Commissioner of the Fisheries for the State of Alaska (the "Commissioner of the Fisheries"), asking the district court to declare those regulations unconstitutional as a taking of property without just compensation and as a violation of Plaintiffs' due process rights. The district court granted summary judgment in favor of the Commissioner of the Fisheries. On de novo review, *Ward v. Ryan*, 623 F.3d 807, 810 (9th Cir. 2010), we affirm.

## I.  OVERVIEW OF ALASKA'S FISHING LAWS

The Alaska Constitution prohibits the state from creating an "exclusive right or special privilege of fishery . . . in the natural waters of the State." Alaska Const. art. VIII, § 15. But it allows Alaska to "limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State." *Id.* The state legislature has the authority to decide how Alaska's resources should be utilized, developed, and conserved. *Id.* § 2.

By enacting Alaska Statutes section 16.05.221, the legislature delegated that authority to a seven-member Board of Fisheries (the "Board"). The Board may "adopt regulations . . . establishing restricted seasons and areas necessary for . . . setting quotas, bag limits, harvest levels, and sex and size limitations on the taking of fish." *Id.* § 16.05.251(a)(2), (3). Likewise, the Board may regulate "commercial . . . fishing as needed for the conservation, development, and utilization of fisheries." *Id.* § 16.05.251(a)(12). The regulations must "provide a fair and reasonable opportunity for the taking of fishery resources by personal use, sport, and commercial fishermen." *Id.* § 16.05.251(d).

When allocating the state's fishery resources among personal, sport, and commercial uses, the Board must consider seven specified criteria. *Id.* § 16.05.251(e). They include the historical uses of each fishery and the importance of each fishery both to the economy and to family or personal consumption. *Id.* If a particular stock of fish cannot sustainably support both traditional subsistence fishing and other consumptive uses, such as commercial take, the Board must adopt regulations "that eliminate other consumptive uses in order to provide a reasonable opportunity for subsistence uses." *Id.* § 16.05.258(b)(3)(B).

The Alaska Administrative Code provides guidelines that the Board must follow when adopting regulations. At least twice each year, the Board must solicit proposals to change its regulations. Alaska Admin. Code tit. 5, § 96.625(b). The Board must make available to the public the proposals that it receives, and it must hold public meetings to gather local comments on proposed changes. *Id.* § 96.625(c). The Board then must vote in public session whether to adopt each proposed change. *Id.*

To control commercial fishing further, the legislature created a three-member Alaska Commercial Fisheries Entry Commission (the "Commission"). The Commission regulates entry into commercial fisheries[1] for all fishery resources in Alaska. Alaska Stat. § 16.43.100(a)(1). In doing so, the Commission establishes qualifications for the issuance of entry permits, *id.* § 16.43.100(a)(6); sets the number of entry permits for each area, *id.* § 16.43.100(a)(9); and provides for the transfer and re-issuance of entry permits to qualified transferees, *id.* § 16.43.100(a)(11). In general, no one may fish commercially in Alaska without a valid entry permit. *Id.* § 16.43.140(a).

Once issued an entry permit, a commercial fisher must renew it annually. *Id.* § 16.43.150(c). If he or she neglects to do so for two consecutive years, the fisher generally forfeits the permit to the Commission. *Id.* § 16.43.150(d). The statute provides that "*[a]n entry permit constitutes a use privilege that may be modified or revoked by the legislature without compensation.*" *Id.* § 16.43.150(e) (emphasis added). Nevertheless, a holder of a transferable entry permit[2] may, subject to approval by the Commission, transfer the permit to another

---

[1]For purposes of the Commission's activities, "fishery" means "the commercial taking of a specific fishery resource in a specific administrative area with a specific type of gear." Alaska Stat. § 16.43.990(4).

[2]The Commission may issue both transferable and non-transferable permits. Alaska Stat. § 16.43.150(i).

fisher. *Id.* § 16.43.170(b). A transferable permit also passes by right of survivorship upon the death of the permit holder. *Id.* § 16.43.150(h). But as to *all* entry permits, holders remain "subject to all regulations adopted by the Board of Fisheries." *Id.* § 16.43.950.

When the biological condition of a fishery or long-term market conditions make it appropriate, the Commission may decrease the optimum number of entry permits for the affected fishery. Alaska Stat. § 16.43.300. If the number of entry permits previously issued exceeds the revised optimum number of permits, the Commission must institute a buy-back program to purchase transferable entry permits, using money set aside in a buy-back fund established for each affected fishery. *Id.* §§ 16.43.310-.320. The program must cease as soon as the number of outstanding entry permits equals the new optimum number. *Id.* § 16.43.320.

After obtaining a valid entry permit, a commercial fisher may also buy a lease of tidal or submerged land in the fishery in which the permit allows him or her to fish. *Id.* § 38.05.082(a). The term of such a lease may not exceed 10 years. *Id.* § 38.05.082(c). Such a lease allows the fisher to use shore gill nets or set gill nets to take fish, as well as to exclude other commercial fishers from the leased land. *Id.* § 38.05.082(a). Only the Director of the Division of Lands of the Department of Natural Resources may grant such a lease, and may do so only with the approval of the Commissioner of the Department of Natural Resources. *Id.*

A fisher who holds a lease must use the leased area personally and must use it only for fishing. *Id.* § 38.05.082(c). For example, the leaseholder may not erect any permanent structure. Alaska Admin. Code tit. 11, § 64.060. With the Director's approval, a leaseholder may sublease or assign some or all of the leased land. Alaska Stat. § 38.05.095(a). But the legislature provided further that "*[t]he lease of submerged land*

*conveys no interest in the water above the land or in the fish in the water.*" *Id.* § 38.05.082(e) (emphasis added).

## II. PROCEEDINGS BELOW

Plaintiffs hold entry permits to fish in the Cook Inlet, which is located off the south-central coast of Alaska. Plaintiffs Vandevere and McCombs hold permits to use drift gill nets to catch salmon, which they then sell in the international seafood market. Plaintiffs Hollier and Jent have permits to use set gill nets and to fish for salmon; these plaintiffs also hold leases to submerged lands in the Cook Inlet, where they place the set gill nets.

Plaintiffs sued the Commissioner of the Fisheries in May 2007, seeking declaratory and injunctive relief. They challenge several sets of regulations, promulgated by the Board, that changed the way it allocated salmon in the Upper Cook Inlet.

The events that give rise to Plaintiffs' claims began in 1978, when the Board instituted the Upper Cook Inlet Salmon Management Plan (the "Plan"). The Plan allocated salmon in that location among the region's commercial gill net fishers and recreational in-river fishers in the Kenai, Kasilof, and Susitna Rivers. Alaska Admin. Code tit. 5, § 21.363 (1978). The Plan largely favored commercial fishers over their recreational counterparts. As a result of the Plan's provisions, set net salmon fishers could fish commercially in the Kasilof, Kenai, and East Foreland sections of the Cook Inlet's central district from June 25 to August 15, while drift net fishers could fish throughout the Cook Inlet from June 25 to December 31. Plaintiffs first acquired their permits and leases during that regulatory regime.

Beginning in 1996, the Board began to shift its approach to salmon fishing in the Cook Inlet, placing a greater emphasis on salmon conservation and giving less priority to commercial

fishing. As a result, the length of the drift gill net season was shortened, and the areas in which such fishers could operate was reduced, with the promulgation of the Northern District Coho Salmon Plan, Alaska Admin. Code tit. 5, § 21.358 (1996). The Board advanced the final day of commercial salmon fishing using drift gill nets from December 31 to August 9. At the same time, the Board restricted drift gill net permit holders from operating in certain areas of the Cook Inlet during what otherwise would be priority commercial fishing times.

In 1997 the Board changed the length of the set gill net season as well, when it adopted the Kenai River Coho Salmon Conservation Management Plan, Alaska Admin. Code tit. 5, § 21.357 (1997). Therein, the Board moved the opening date of the set gill net season from June 25 to July 8 and, at the same time, advanced the closing date from August 15 to August 10. The Board further limited the set gill net season in 2002, when it prohibited set gill net salmon fishing for more than one 24-hour period between August 1 and August 7. Alaska Admin. Code tit 5, § 21.357 (2002).

The Board instituted additional restrictions on commercial salmon fishing in 1999, with Alaska Admin. Code tit. 5, §§ 21.357-.360, 21.363 (1999). Those regulations reduced the areas of the Cook Inlet in which salmon fishing could take place, depending on the sizes of the salmon populations, *id.* §§ 21.358-.359, and replaced an earlier regulation that gave priority to commercial take of Cook Inlet salmon stocks with a new regulation emphasizing instead the conservation of the area's salmon population, *id.* § 21.363. "[W]here there are known conservation problems," the amended regulation provided, "the burden of conservation shall, to the extent practicable, be shared among all user groups in close proportion to their respective harvest of the stock of concern." *Id.*

In addition to establishing those general restrictions, in 2002 the Board enacted various restrictions on commercial

fishing for particular kinds of salmon specific to individual regions of the Cook Inlet. The 2002 regulations limited fishing for pink salmon and coho salmon in the Cook Inlet's northern district and in the Kenai River, Alaska Admin. Code tit. 5, § 21.356 (the "Cook Inlet Pink Salmon Management Plan"); king salmon in the Kenai River, *id.* § 21.359 (the "Kenai River Late Run King Salmon Management Plan"); sockeye salmon in the Kenai River, *id.*, § 21.360 (the "Kenai River Late Run Sockeye Salmon Management Plan"); and sockeye salmon in the Kasilof River, *id.* § 21.365 (the "Kasilof River Salmon Management Plan").

Plaintiffs' complaint alleges that the regulatory changes since 1996 have diminished the value of their entry permits and shore leases. Plaintiffs claim that the Fifth Amendment's Takings Clause[3] requires the State of Alaska to provide just compensation equal to the amount by which the Board's recent regulations have reduced the value of their permits and leases. Plaintiffs further assert that the regulations violate their substantive due process rights. They seek a declaratory judgment and an injunction against further enforcement of the challenged regulations.

After awaiting a decision by the Alaska Supreme Court in a nearly identical case, *Vanek v. State*, 193 P.3d 283 (Alaska 2008), the district court in this case granted summary judgment to the Commissioner of the Fisheries. The district court held that, under *Vanek*, Plaintiffs lack a property interest in their entry permits, that they had expressly waived any right to compensation with respect to their shore leases, and that they had not suffered a due process violation. Plaintiffs then brought this timely appeal.

---

[3]The relevant part of the Fifth Amendment provides:

No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## III.   ENTRY PERMITS

We first consider Plaintiffs' claims concerning their entry permits.

### A.   *State law defines Plaintiffs' rights in the entry permits.*

**[1]** The Takings Clause, which is incorporated against the states through the Fourteenth Amendment, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980), prevents a state from taking private property for public use without just compensation. *Ward*, 623 F.3d at 810. To establish a violation of the Takings Clause here, Plaintiffs first must show that they have a property interest in their entry permits. *Id.* Only if they have such an interest would we proceed to the second part of the inquiry—whether an expropriation of that interest constitutes a "taking" within the meaning of the Fifth Amendment, for which the state would owe compensation. *Id.*

**[2]** The first question—whether a property right *exists* in the entry permits—is a question of state law. As we explained recently in *Ward*, "[p]roperty interests are not constitutionally created; rather, protected property rights are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). In several earlier cases, too, we expressed the principle that we look to state law to determine what property rights exist and therefore are subject to "taking" under the Fifth Amendment. *See, e.g., Richmond Elks Hall Ass'n v. Richmond Redev. Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977); *United States v. Puget Sound Power & Light Co.*, 147 F.2d 953, 954-55 (9th Cir. 1945).

The second question—whether a property right has been *abridged* improperly (taken without just compensation)[4] or

---

[4]We pause to observe that any branch of state government could, in theory, effect a taking. *See, e.g., Stop the Beach Renourishment, Inc. v. Fla.*

whether a plaintiff has given up the right to assert such a claim—is a question of federal law. As to a question of federal law, including this one, we owe no deference to state courts. *See, e.g., Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9-21 (1978) (examining state law to determine the extent of the relevant property interest, but then independently deciding what process was due before the state could invade that interest).

The Supreme Court recognized this distinction, albeit obliquely, in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). *Lucas* involved an owner of beachfront real property who wanted to build houses there. *Id.* at 1008. After he bought the property, but before he could build on it, the state enacted a statute prohibiting any permanent inhabitable structure on the land in question. *Id.* The landowner sued in state court; the state supreme court eventually rejected his Takings Clause challenge. *Id.* at 1009, 1020. That court held

*Dep't of Envtl. Prot.*, 130 S. Ct. 2592, 2601-02 (2010) (plurality) (writing that a state court, as well as a state legislature, can "take" private property). We also note that a federal court remains free to conclude that a state supreme court's purported definition of a property right really amounts to a subterfuge for removing a pre-existing, state-recognized property right. That is, we need not take a state court at its word as to the kind of analysis that it is performing. *See, e.g.*, *Webb's Fabulous Pharmacies*, 449 U.S. at 160-64 (holding that a state may not simply recharacterize private property as public property by *ipse dixit*).

To take a far-fetched example, if a state enacts a statute to evict 10 people from their homes to create a park, the state's courts could not avoid a conclusion that a "taking" had occurred by holding that the 10 people never had a property right in their houses. *See, e.g.*, *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 448 (2d Cir. 1980) ("[A]lthough the primary source of property rights is state law, the state may not magically declare an interest to be 'Non property' after the fact for Fourteenth Amendment purposes if, for example, a longstanding pattern of practice has established an individual's entitlement to a particular governmental benefit."); *accord Winkler v. County of DeKalb*, 648 F.2d 411, 414 (5th Cir. 1981) (agreeing with that statement in *Quinn*).

that, in the legitimate exercise of its police power, the state could restrict the owner from using his land "to mitigate the harm to the public interest that [such a] use of his land might occasion." *Id.* at 1020-21.

The Supreme Court disagreed. It held that, when "the State seeks to sustain regulation that deprives land of all economically beneficial use, . . . it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Id.* at 1027. The Court remanded the case for the *state* courts to decide whether "background principles of . . . property law . . . prohibit the uses [that the owner] now intends in the circumstances in which the property is presently found." *Id.* at 1031. In other words, the Court's quarrel with the state supreme court did not concern the *extent of the property interest* in the beachfront land, which the Court's remand order firmly suggests is a matter of state law but, rather, concerned the *extent to which the state could invade* a property interest without providing just compensation, which is a matter of federal law.

The Court acknowledged a similar distinction in *Craft*. In that case, two customers sued their utility company for turning off their utilities without having given them a fair opportunity to prove that they had paid their bills or that the bills were inaccurate. 436 U.S. at 3-4. As an initial matter, the Court had to decide whether the customers possessed a property interest in their utilities. *Id.* at 9. The Court directly examined prior decisions of the *state* courts for the answer. *Id.* at 9-10. "In defining a public utility's privilege to terminate for nonpayment of proper charges, [state] decisional law draws a line between utility bills that are the subject of a bona fide dispute and those that are not." *Id.* at 9.

Having found the customers' property interest definitively established by decisions of the state courts, the Court turned to the remaining question: What process must the utility com-

pany provide before turning off the customers' service? *Id.* at 12. Again, the Court's two-step method of analysis suggests that state law governs the demarcation of a property right, while federal law governs the manner in which the state must respect a right so defined.

**[3]** Our court has emphasized the primacy of state law in delineating property rights with respect to state-created licenses of the type at issue here. In *Schneider v. California Department of Corrections*, 151 F.3d 1194, 1195-96 (9th Cir. 1998), state prisoners challenged a policy that prevented them from earning interest on money that state law required them to place in a special account while incarcerated. A state statute directed the interest accruing on the funds in that account to an "Inmate Welfare Fund," rather than to the prisoners themselves upon their release. *Id.* at 1196. Following the Supreme Court's direction in *Webb's Fabulous Pharmacies*, we held that the prisoners had a constitutionally protected property right to keep the interest on their own funds. *Schneider*, 151 F.3d at 1201.

In reaching that conclusion, for the purposes of Takings Clause analysis we distinguished "old property" rights, such as the right to retain interest on principal funds that one owns, from "new property" rights. *Id.* at 1200-01. With respect to "new property," "certain nontraditional forms of property—such as public employment, welfare assistance, *state contracts and licenses*, and other government largesse"—the state has the final say on what interests one possesses. *Id.* at 1200 (emphasis added).[5]

We recognize the tension between our analysis in *Schneider* and the First Circuit's Takings Clause analysis in *Hoffman v. City of Warwick*, 909 F.2d 608 (1st Cir. 1990), but we

---

[5]*See also supra* note 4. The statute in dispute in *Schneider* can be seen as mere *ipse dixit*, attempting to transform previously existing, state-recognized property rights into non-property.

continue to think that *Schneider* embodies the better view. In *Hoffman*, two military veterans sued their employers—two cities in Rhode Island—claiming that the employers had deprived them of property without just compensation when they refused to grant seniority credit for the length of the veterans' military service. A similar suit already had reached the Rhode Island Supreme Court. *Id.* at 613-14 & n.5. The state supreme court rejected the Takings Clause challenge, holding that the original statute granting seniority credit had not created "vested rights to seniority credit, but merely created 'gratuities or floating expectancies,' until the benefits that would flow from enhanced seniority [were] actually received by employees." *Id.* at 613-14 (quoting *Brennan v. Kirby*, 529 A.2d 633, 641 (R.I. 1987)). Relying on that state supreme court decision, the district court in *Hoffman* dismissed the veterans' complaint for failure to state a viable claim. *Id.* at 614.

On appeal to the First Circuit, the employers argued that, "because any property interest in enhanced seniority arises from state law, of which the Rhode Island Supreme Court is the final arbiter, [the] plaintiffs' vested property rights claim [was] foreclosed." *Id.* at 615. The First Circuit disagreed, explaining:

> The [employers'] argument misconstrues the role of state law in determining the scope of protection afforded to property rights under the federal Constitution. That the property interest allegedly protected by the federal Due Process and Takings Clauses arises from state law does not mean that the state has the final say as to whether that interest is a property right for federal constitutional purposes. Rather, federal constitutional law determines whether the interest created by the state rises to the level of "property," entitled to the various protections of the Fifth and Fourteenth Amendments.

*Id.* The First Circuit therefore conducted its own analysis to determine the extent of the veterans' property interest.

*Hoffman* essentially collapses the two-step process set out in *Lucas* and *Craft* into a single step, in which the federal courts, guided by their own precedents, decide *both* the extent of a person's property interest *and* the question whether the state sufficiently has invaded that interest such that it owes just compensation. For the reasons already discussed, we find the First Circuit's approach out of step with the Supreme Court's instruction. Rather, we think that our rule in *Schneider* more faithfully adheres to the Supreme Court's case law, and we also think that our rule makes more sense in the present context. It would be anomalous to conclude that, in the absence of a statutory or contractual provision for compensation, the state must compensate those regulated when the state regulates an interest that the state itself created in the first place and explicitly made subject to future regulation. In any event, *Schnieder* is the law of our circuit and we are bound to follow it. We therefore turn to exploring what interest Alaska law creates in Plaintiffs' entry permits.

B.    *Under Alaska law, Plaintiffs have only a license, and not a protected property interest, in the entry permits.*

**[4]** When presented with a question of state law, including a question as to the existence or extent of a property right, we must apply a relevant decision by the state's highest court. *See, e.g., United Bhd. of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957, 963 (9th Cir. 2008) ("In analyzing questions of state law, we are bound by the decisions of the state's highest court."). Here, the thing at issue—an entry fishing permit—is a creature of Alaska state law. The nature and extent of Plaintiffs' rights in that permit therefore are issues of Alaska law to be decided by the Alaska Supreme Court.

**[5]** In *Vanek*, commercial salmon fishers holding Cook Inlet entry permits and shore fishery leases brought a class action, seeking a declaration that a series of regulations promulgated by the Alaska Board of Fisheries since 1996 caused

a taking of their property without just compensation. 193 P.3d at 285. The Alaska Supreme Court held that "the entry permits are not property interests." *Id.*

The court began its analysis by framing the issue. "The fishers argue that their entry permits are property for purposes of takings analysis." *Id.* at 288. The *Vanek* plaintiffs' arguments on that question echoed the arguments that Plaintiffs advance here, for example, that the entry permits have economic value, that some of them are transferable, that the Board of Fisheries lacks regulatory power to modify or revoke the permits, and that the permits can be used as collateral for loans. *Id.* The court also set out the state's response, which was that the permits grant only "a use privilege or license to fish, subject to all applicable regulations adopted by the board of Fisheries." *Id.*

**[6]** Next the court analyzed state statutes. Of central importance to the court's decision was Alaska Statutes section 16.43.150(e), which provides that "[a]n entry permit constitutes a use privilege that may be modified or revoked by the legislature without compensation." *Vanek*, 193 P.3d at 288-89. The court considered an Alaska Attorney General Opinion and an article from the Alaska Law Review,[6] along with the history and context of section 16.43.150(e). *Id.* at 289. Finally, the court examined at length its own precedents and the effect of state constitutional provisions that reserve fish to the people for common use, Alaska Const. art. VIII, § 3, and ban exclusive rights in fisheries, *id.* § 15. *Vanek*, 193 P.3d at 289-94. After that exhaustive consideration of state-law sources, the Alaska Supreme Court held that, as a matter of state law, an entry permit to fish commercially for salmon in the Cook Inlet is not "property" for the purpose of requiring compensation when its value decreases due to state regulation. *Id.* at 293-94.

---

[6]Jon David Weiss, *A Taxing Issue: Are Limited Entry Fishing Permits Property?*, 9 Alaska L. Rev. 93, 96, 112 (1992).

**[7]** On this question of state law, which is the same as the first question that we face here, we must follow *Vanek*. Therefore, in reliance on this recent opinion of the Alaska Supreme Court, we hold that Plaintiffs' entry permits are not property for purposes of a takings claim. Accordingly, we need not consider the second step of a full takings analysis. *Ward*, 623 F.3d at 810.

## IV.   FISHERY LEASES

Next we examine Plaintiffs' claims with respect to the shore fishery leases. The Alaska Supreme Court held that leases of submerged land, of the kind that two Plaintiffs in this case hold, confer a "limited property interest" in submerged land, although that interest does not include "the right to harvest fish free of state regulation." *Vanek*, 193 P.3d at 294-95. We need not decide whether the state impaired Plaintiffs' "limited property interest" under the leases,[7] though, because Plaintiffs contractually waived any takings challenge to the regulations at issue.

**[8]** The Supreme Court has instructed that a person may agree contractually, in advance, to accept without compensation what otherwise would be a compensable taking under the Fifth Amendment. In *United States v. Petty Motor Co.*, 327 U.S. 372, 374 (1946), tenants sued the federal government for temporarily condemning a building for governmental purposes during the term of the tenants' lease of the building. One of the tenants had signed a written lease agreement with the owner, which included "a clause for its termination on the

---

[7]We pause to observe, though, that the leases merely permit fishers to set nets on particular parcels of submerged land and to exclude other fishers from those areas. They do not directly provide a right to the fish that swim in the waters above the parcels. We therefore question whether the state has impaired Plaintiffs' property interest at all because, according to Plaintiffs' theory, the challenged regulations affect the number of fish that they can catch, not their right to exclude other fishers from the land that they have been leased.

Federal Government's entry into possession of the leased property for public use." *Id.* at 375. The Supreme Court held that the foregoing clause extinguished any claim that the tenant otherwise would have had against the United States under the Takings Clause: "The [tenant] had contracted away any rights that it might otherwise have had. . . . With this type of clause, at least in the absence of a contrary state rule, the tenant has no right which persists beyond the taking and can be entitled to nothing." *Id.* at 376.

Although the facts in *Petty Motor Co.* concerned the extinguishment of an interest in the lease, rather than the extinguishment of a right to compensation during the pendency of the lease, that distinction does not suggest a different result, nor does it suggest that a different rule would apply here. Indeed, application of the rule in the present context makes sense, because the Takings Clause does not prevent the government from taking private property for public use; rather, the Takings Clause requires compensation when such a taking occurs.[8] Compensation can be fixed in advance, or it can be waived, by contract. Applying the *Petty Motor Co.* principles here, we conclude that Plaintiffs expressly waived their right to mount a Takings Clause challenge to the Board's regulations. *See also Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 304 (1976) (recognizing that "[a] number of factors . . . could operate to eliminate the existence of compensable value in [a] leasehold interest," including when the statute authorizing the making of the lease "provided . . . that any lease of trust land was revocable at will by the State" without compensation, or when "a provision of [that] kind [is] included in the lease"); *United States v. Right to Use & Occupy 3.38 Acres of Land*, 484 F.2d 1140, 1144 (4th Cir. 1973) (holding that a lessee waived her right to just compensation for a government

---

[8]Moreover, in general, a person may waive basic constitutional rights. *Campbell v. Blodgett*, 978 F.2d 1502, 1508 (9th Cir. 1992) (per curiam) (quoting *Peretz v. United States*, 501 U.S. 923, 936-37 (1991)).

taking through a valid condemnation clause written into her lease).

**[9]** Plaintiffs' lease agreements run for a 10-year term and call for payment of $300 per year. The third unnumbered paragraph of each agreement provides:

> This lease is subject to all applicable state, federal, and municipal statutes, regulations, and ordinances in effect on the effective date of this lease, and insofar as is constitutionally permissible, to all statutes, regulations, and ordinances placed in effect after the effective date of this lease. A reference to a statute, regulation, or ordinance in this lease includes any change in that statute, regulation, or ordinance, whether by amendment, repeal and replacement, or other means. *This lease does not limit the power of the State of Alaska*, its political subdivisions, or the United States of America to enact and enforce legislation or *to adopt and enforce regulations or ordinances affecting, directly or indirectly, the activities of the lessee or its agents in connection with this lease or the value of the interest held under this lease*. In case of conflicting provisions, statutes, regulations, and ordinances take precedence over this lease. This lease shall not be construed as a grant or recognition of authority for promulgation or adoption of municipal ordinances that are not otherwise authorized.

(Emphasis added.)

The next paragraph of each agreement, numbered paragraph 1, states that the lease is issued under the authority of Alaska Statutes section 38.05.082. As we quoted earlier, that statute provides that a "lease of submerged land conveys no interest . . . in the fish in the water." *Id*. § 38.05.082(e).

Further, paragraph 11 of Plaintiffs' lease agreement sets out provisions related to condemnation of all or part of the physical area of the leasehold, or the improvements on it, by means of eminent domain. If eminent domain proceedings result in a reduction of 30 percent or more of the ground area of the leasehold, the lessee may elect to terminate the lease.

Finally, each of Plaintiffs' lease agreements provides (in numbered paragraph 26) that the lessee shall comply with all existing and later-enacted environmental laws, at the lessee's own expense.

**[10]** Read together, those provisions of Plaintiffs' leases show that the parties clearly distinguish between condemnation of the physical location covered by the lease (or condemnation of tangible improvements thereon), which results in compensation to the lessee, and regulation of the lessee's "activities . . . in connection with th[e] lease," which does not. Fishing is just such an activity in connection with the lease. Stated another way, under the terms of their contractual arrangement, the lessees intended to preserve their right to receive compensation for a taking of the physical area of the leasehold but not for a regulatory taking of activities conducted at the leased location. The lease plainly exempts regulatory takings of the kind challenged here from the requirement that Plaintiffs receive just compensation. Moreover, the very small amount of the annual lease payment suggests that the lessees took the risk that more stringent regulation of their fishing activities in the future might reduce the commercial value of their leases.

**[11]** In summary, we hold that Plaintiffs contractually waived their right to challenge the regulations when they signed their lease agreements. For that reason, we need not and do not analyze this claim on the merits.

## V.   SUBSTANTIVE DUE PROCESS

**[12]** Finally, we consider Plaintiffs' substantive due process claim. Plaintiffs argue that Alaska Statutes section

16.43.150(e), which provides that "[a]n entry permit constitutes a use privilege that may be modified or revoked by the legislature without compensation," violates their substantive due process rights. To establish such a violation, Plaintiffs must demonstrate that section 16.43.150(e) is "unreasonable, arbitrary, or capricious" or that its means have no "real and substantial relation to the object sought to be attained." *Nebbia v. New York*, 291 U.S. 502, 525 (1934); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (explaining that the guarantee of substantive due process protects against governmental power arbitrarily and oppressively exercised).

**[13]** Plaintiffs tie their due process challenge to their takings challenge. They argue that section 16.43.150(e) violates substantive due process by "arbitrarily" declaring that their entry permits are mere licenses or use privileges, rather than property for whose diminishment in value the Takings Clause entitles them to compensation. But, as explained above, state law simultaneously creates and cabins the entry permit system. Alaska was not required to create only commercial fishing permits that carry all the characteristics of Takings Clause-protected "property." Its decision to enact a system of licenses or use privileges was not unreasonable, arbitrary, or capricious, and the statute bears a substantial and reasonable relationship to Alaska's goals of salmon conservation and maintenance of a sustainable fishery. We therefore hold that Alaska Statutes section 16.43.150(e) does not violate Plaintiffs' substantive due process rights.

AFFIRMED.